UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD CRUZ,

                    Plaintiff,

        -v-                                             No. 03 Civ. 8863 (LTS)(JCF)

OXFORD HEALTH PLANS, INC.,

                    Defendant.

_____

OPINION AND ORDER

APPEARANCES:

BARBARA MATTHEWS, ESQ.              THELEN REID BROWN RAYSMAN &
P.O. Box 757                                    STEINER LLP
125 Jefferson Avenue                       By: Mitchell L. Fishberg, Esq.
St. James, New York 11780                185 Asylum Street
                                                       Hartford, Connecticut 06103

*Attorney for Plaintiff*                      *Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Richard Cruz ("Plaintiff" or "Cruz") brings this employment discrimination action against his former employer Oxford Health Plans, Inc. ("Defendant" or "Oxford"). In his Amended Complaint,[1] Cruz asserts that Oxford violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, et seq., and the New York State Human Rights Law, New York Executive Law §§ 290 et seq., by allowing its agents to create a hostile work environment, to discriminate against Cruz because of his gender, to condition terms of his employment on requests for sexual favors, and to retaliate against Cruz for reporting this inappropriate conduct.[2] Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant has also moved to strike Plaintiff's attorney's certification in opposition to the summary judgment motion, and seeks sanctions against Plaintiff's attorney. Plaintiff has cross-moved to reopen discovery.

The Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

The Court has considered carefully all of the parties' submissions. For the reasons stated below, Defendant's motion for summary judgment is granted in its entirety. Defendant's motion to strike is granted as to paragraphs ten through twenty-seven of Plaintiff's attorney's certification. Defendant's request for sanctions is denied. Plaintiff's cross-motion to

---

[1] The Amended Complaint is denominated "Complaint" and was filed on October 29, 2004 (docket entry no. 16).

[2] Plaintiff's employment discrimination claims under New York State Human Rights Law are subject to the same standard of proof as claims under Title VII. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Borrero v. American Express Bank, Ltd., No. 05 Civ. 10801 (DC), 2008 WL 313602, *10 (S.D.N.Y. Feb. 5, 2008).

reopen discovery is denied.


<u>BACKGROUND</u>

Except as otherwise specified, the following material facts are undisputed.

Defendant Oxford is a managed health care insurance company based in Trumbull, Connecticut,

with offices in various states including New York.  In July 1996, Oxford hired Plaintiff Richard

Cruz to work in its Medical Management Department as a Medical Management Coordinator

("MMC") in its White Plains office.  His job responsibilities as an MMC consisted of fielding

telephone inquiries from hospitals and doctors' offices regarding authorizations and pre-

certifications.  By 1997, Cruz began performing additional "liaison" duties or "special projects,"

as did other MMCs.  A performance review, prepared by Plaintiff in July 1997, recited that he

had been offered the position of Liaison sometime during his first year at Oxford.  (Fishberg

Decl., Ex. 16.)  Plaintiff listed his position as "BRK Liaison" on his review form, but testified at

his deposition that he never received any documentation from Oxford indicating an official

change in title.  (Cruz Dep. at 56-57.)  Plaintiff's supervisor at the time, Carol Feeney

("Feeney"), stated in a September 5, 1997, performance evaluation that Plaintiff had "assumed

the role of Liaison for the Brooklyn Team" and that he had performed very well.  On the

evaluation form, Feeney identified Plaintiff's position as MMC.  (Fishberg Decl., Ex. 17.)

During the relevant periods, Oxford's written policies provided employees with a

specific number of "select days" off that could be used for any purpose during the year, but

distinguished between "planned" select days (those of which the employee gave the company at

least 24 hours' advance notice) and "unplanned" days.  Oxford's policies provided that excessive

use of unplanned days could lead to corrective action.  The protocol for MMCs was that they were to call an Absentee Hotline to report any unplanned absences.  (Def. 56.1 Stmt. ¶ 14.[3])  The Medical Management Department had an "availability to work" standard for monitoring employees' records with respect to adherence to their work schedule.  Based on Cruz's three unplanned select days during the July 15,1996, to March 10, 1997, "Availability to Work" review period, Feeney characterized Cruz's performance as "below expectations" in this regard, and issued him a written warning and counseled him that additional unplanned absences could result in disciplinary action.  (Id. ¶ 15.)

By 1998, Oxford had become increasingly concerned about performance and efficiency levels in the White Plains office, including the office's phone call handling volume. (Id. ¶ 23.)  Oxford decided to bring White Plains and all of its other offices that were staffed with MMCs into compliance with the standards maintained at its Trumbull, Connecticut, headquarters.  (Id. ¶ 24.)   In July 1998, Loretta ("Laurie") DeRosa ("DeRosa") was assigned to Oxford's White Plains office from the Trumbull headquarters, and was tasked with restructuring and improving the overall efficiency of the office.  (Id. ¶¶ 25-26.)  As part of the restructuring plan, DeRosa was directed develop a plan to return the White Plains MMCs who were working as Liasons to their normal duties of responding to telephone inquiries.  (Id. ¶ 28.)  Throughout 1999, both male and female MMCs were returned to the telephone duty function on a full time basis.  (Id. ¶¶ 58, 61-63.)  In an April 1999 performance evaluation issued to Plaintiff by Carol Feeney, Feeney commented that "[a]ny change in [Plaintiff's] job responsibilities is a reflection

---

[3]     References to the parties' statements of material fact submitted pursuant to S.D.N.Y. Local Civil Rule 56.1 incorporate by reference the evidentiary material cited in the particular paragraphs.

of organizational change and not his ability." (Fishberg Decl., Ex. 19.)  Plaintiff's compensation and benefits remained the same when his duties were changed.   (Cruz Dep. at 84; Def. 56.1 Stmt. ¶ 63.)

Cruz's work hours were changed from 8:00 a.m. to 4:30 p.m. to 9:30 a.m. to 6:00 p.m. around the time period in which his duties were changed.  Cruz alleges that the shift change occurred sometime after December 1999.  (Def. 56.1 Stmt. ¶ 65.)  The work hours of other MMCs were changed in connection with the restructuring as well.  (Id. ¶ 67.)

In January 1999, Feeney issued Plaintiff a warning concerning excessive unplanned absences taken during the year 1998. (Id. ¶ 30.)  In his February 1999 self-evaluation form for the 1998 work year, Plaintiff complained that he still had the title of coordinator despite his three years with the company and that he felt he had reached a "stone wall regarding any advancement within the company." (Id. ¶ 31.)

Plaintiff alleges that, in early 1999, DeRosa asked him to attend two meetings to explain the role of "Liaison" to Oxford doctors.  (Id. at 85.)  After that first meeting, DeRosa told him to wear a certain brown suit that "looked good" on him at the next meeting.[4]  (Id.)  After that second meeting, DeRosa came over to his desk, thanked him for attending the meeting and stroked the back of his head.  (Id. at 92.)  At the time, Plaintiff took DeRosa's actions as being "innocent" and "overly friendly."  (Id. at 88, 94.)

Plaintiff alleges that he applied for the job of Project Manager sometime before

---

[4]     Oxford's submissions include an affidavit in which DeRosa denies these allegations but, for purposes of this summary judgment motion practice, Defendant does not dispute Plaintiff's claim that the incident concerning the suit occurred.  (Def. Reply to Pl.'s Resp. To Def. 56.1 Stmt. ¶ 35; 4/30/05 DeRosa Aff. ¶¶17-18.)

September 1999 by informing DeRosa and Sharon Brown ("Brown"), a supervisor in his department, of his interest in the position. (Id. at 117, 119.) Oxford's written employment policies required at all relevant times that, to apply for a posted position, an applicant had to meet with a Human Resources representative, obtain the department manager's signature on the application, and submit a written application and resume to Human Resources. (Fishberg Decl., Ex. 12.) Plaintiff stated at his deposition that he had not followed that application procedure for posted positions because the Project Manager position had not officially been posted. (Cruz Dep. at 117, 119, 121.) Plaintiff also alleges that, in practice and notwithstanding the written policy, employees were to speak to their supervisors about open positions or positions for which an employee might want to apply. (Id. at 212:17-213:14.) Both men and women applied for the position. Neither DeRosa nor Brown had any role in selecting the candidate who obtained the Project Manager position. (Def.'s 56.1 Stmt. ¶ 40.[5]) In October 1999, upon learning that Rosa Petagine had been named for the position, Plaintiff and approximately forty co-workers (male and female) submitted a memorandum to the human resources department expressing their frustration at the position not having been posted and asserting that employees in the department were "selected by favoritism as opposed to knowledge of the job." (Fishberg Decl., Exs. 20-21; Def. 56.1 Stmt. ¶ 39.)

Plaintiff alleges that he applied for various unposted positions throughout 1999, including those of Provider Relations, Team Leader, and ENT Supervisor, though he proffers no

---

[5]     Plaintiff alleges that the successful candidate got the job because she was a friend of DeRosa, and proffers unattributed hearsay to the effect that DeRosa had said that the candidate had been successful because it was DeRosa's "call." (Pl. 56.1 Stmt. ¶ 40.) Neither the conclusory proffer nor the inadmissible hearsay is sufficient to frame a disputed issue of fact on this point.

specific dates.  (Cruz Dep. at 121-122; 216-219.)  He acknowledges that he did not submit

anything in writing, but rather claims to have applied by informing Brown and DeRosa of his

interest in the positions.  (Id. at 213)  Plaintiff does not identify exactly who was chosen for the

positions or what their qualifications were, nor does he assert that Brown or DeRosa were

directly responsible for those hiring decisions.  (Id. at 218-220, 211.)

At some point during the October-November 1999 time frame, Brown led a

meeting in which she explained to the White Plains MMCs that expectations had been increased

and that policies and procedures would be enforced more rigorously.  (Def. 56.1 Stmt. ¶ 69.)

Supervisors began to enforce polices such as those governing personal phone calls and adherence

to break and lunch hour schedules more strictly.  (Id. ¶ 70.)  MMCs were frequently written up

for infractions including extended lunch periods and personal telephone calls.  (Id. ¶ 71.)

In October 1999, Feeney resigned.  Plaintiff began reporting to Lisa Bollotino on

October 4, 1999.  (Id. ¶ 47.)  In a November 9, 1999, review covering the October 4th-November

9th period, Bollotino rated Plaintiff in the second-lowest of four performance categories.  (Id. ¶

48.)

Plaintiff alleges that, sometime in late 1999, DeRosa called him into an office and

propositioned him sexually, saying: "I need you to start being a team player . . . If you decide to

play along with me maybe I can further you along here at Oxford . . . Maybe if you and me can

start seeing each other or dating or even going farther than that."  (Id. ¶ 52-53.)  Plaintiff alleges

that he turned her down and that, sometime thereafter, he complained to Brown about the

incident.  (Cruz Dep. at 132, 153-54.)  Plaintiff testified that he did not recall exactly when he

reported the incident to Brown, but knows that he did not do so until after experiencing changes

in his job responsibilities.   (Id. at 153-54.)

Oxford's written telephone use policy, effective July 1, 1995, prohibited non-emergency personal telephone use during work hours, and provided that failure to comply with the policy could result in corrective action up to and including employment termination.  The December 13, 1999, version of the policy announced that Oxford provided telephones for business-related calls and continued: "Although there will be occasions when employees will need to use company telephones for personal reasons, those calls should be made only when absolutely necessary."  The 1999 policy further provided that "Employees who abuse the use of company telephones by making or receiving excessive personal calls will be subject to corrective action up to and including termination of employment."  Both policies provided for the monitoring of use of phones, and Cruz had signed a "Phone Monitoring Release" in July 1996, acknowledging that "business related phone calls may be monitored . . . by appropriate supervisory/management personnel.  The purpose of such monitoring is understood to be evaluative for business purposes."  (Def. 56.1 Stmt. ¶¶ 5-6.)  Plaintiff was issued a verbal warning by Sharon Brown for berating Oxford and using four-letter words during a non-emergency personal phone call to his wife on January 28, 2000.  (Id. ¶¶ 87-88.)  In Plaintiff's performance review issued on February 10, 2000, for the period of April to December 1999, Brown rated Plaintiff's performance as "Below Target," in three of the five evaluation categories. (Fishberg Decl., Ex. 29.)  On February 23, 2000, Plaintiff called in sick by leaving a message on Brown's voice mail saying his stomach was "f***ed up."  (Def.'s 56.1 Stmt. ¶ 96.)  Brown issued Plaintiff a written warning on February 24, 2000, which referred to his "continued use of vulgar and inappropriate language and . . . availability for work" as the reasons for the warning,

citing the February 23, 2000, voicemail message and three unplanned select days taken in January and February 2000.  The written warning concluded: "Should your work availability performance not improve and/or should this display of vulgar behavior occur again, further corrective action may take place up to and including termination of employment."  (Id. ¶ 99.) Plaintiff was then observed on February 29, 2000, making at least two personal phone calls during work hours.  (Id. ¶ 104.)  Brown collected Plaintiff's telephone records and found that, in the previous months, he had made numerous other personal calls during work hours.  (Id. ¶ 105.) Other male and female medical management employees, including other MMCs, were disciplined for vulgar or inappropriate language and/or personal telephone use during work hours.  (Id. ¶¶ 101,112.)

On March 1, 2000, acting on the advice of the human resources department, Brown terminated Plaintiff's employment, citing his repeated failure to adhere to Oxford's policies, taking into account both the verbal and written warnings he had received.  (Id. ¶¶ 113-114.)  Finally, Plaintiff alleges that his unemployment benefits were challenged and temporarily terminated by Defendant after Plaintiff filed charges with the New York State Division of Human Rights.  (Cruz. Dep. at 10:23 - 11:25; Pl. 56.1 Stmt. ¶¶ 117-118.)  Oxford contends that any delayed benefits were ultimately paid within a short period of time. (Def. 56.1 Stmt. ¶¶ 117-118.)

Plaintiff asserts that his failure to obtain promotions at Oxford, changes in his working conditions that he perceived as adverse, scrutiny of his workplace behavior and negative evaluations and warnings concerning his work and behavior, and, ultimately, his termination from employment, were the products of gender discrimination and/or retaliation for his refusal of DeRosa's alleged proposition or his reporting of the alleged proposition.  Notwithstanding the

Defendant's submission of affidavits by Brown and DeRosa denying that DeRosa was involved in the various working condition and discipline decisions, Plaintiff argues that DeRosa was likely involved, based on references to her in some documentation concerning disciplinary actions taken against other employees. (E.g., Pl. 56.1 Stmt. ¶ 60.[6])


## DISCUSSION

### Cross-Motion to Reopen Discovery

Plaintiff requests that the Court reopen discovery in order to permit him to depose Laurie DeRosa and Sharon Brown. Magistrate Judge Francis denied the same request on April 26, 2005. (Def.'s Opp'n. Pl.'s Mot. to Reopen Disc., Exs. D-F.) Plaintiff took no action to appeal the Magistrate Judge's decision within ten days of being served with a copy of the order as permitted by Federal Rule of Civil Procedure 72(a). To the extent the cross-motion is an untimely appeal from Judge Francis' decision, it is denied. The request is also denied to the extent it can be construed as an invocation of Rule 56(f) of the Federal Rules of Civil Procedure, because Plaintiff has failed to make the showing required by that Rule and to explain his failure to take the discovery in a timely manner. Accordingly, the cross-motion to reopen discovery is denied in its entirety.

---

[6]     It should be noted that DeRosa's name does not actually appear in all of the disciplinary records cited by Plaintiff in support of this argument.

<u>Motion for Summary Judgment</u>

*Standard of Review*

Summary judgment should be rendered if the pleadings, discovery materials on file and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (as amended eff. Dec. 1, 2007). The moving party bears the burden of establishing the absence of any genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). A fact is material "if it might affect the outcome of the suit under the governing law." A material fact is genuinely disputed only if the evidence is such that a reasonable jury could find in favor of the non-moving party based on that fact. <u>Holtz v. Rockefeller & Co</u>. 258 F.3d 62, 69 (2d Cir. 2001) (citing <u>Anderson</u>, 477 U.S. at 248).

In opposing a motion for summary judgment, the nonmoving party may not rest on mere allegations of contested facts, but must "set forth specific facts showing that there is a genuine issue." Fed. R. Civ. P. 56(e). "Conclusory allegations, conjecture and speculation" do not establish a genuine issue of fact, and thus will not provide a sufficient basis for a nonmoving party to resist summary judgment. <u>Kerzer v. Kingly Mfg</u>, 156 F.3d 396, 400 (2d Cir. 1998); <u>Cifarelli v. Vill. of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996). The facts will be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences shall be drawn on the nonmovant's behalf. <u>American Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.</u>, 42 F.3d 725, 728 (2d Cir. 1994).

*Gender Discrimination Claim*

_____Plaintiff claims that he was denied promotions, subjected to changes in his duties and work schedule, and subjected to excessive scrutiny and discipline because he is a man, and that female employees were not subjected to such treatment.  Such disparate treatment claims under Title VII are analyzed under the so-called McDonnell Douglass burden-shifting framework.  Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir. 1999); Clark v. New York State Elec. & Gas Corp., 67 F. Supp. 2d 63, 71 n.5 (N.D.N.Y.  1999); see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  A plaintiff must make a prima facie case by showing that he is a member of a protected class, was qualified for the position held, suffered an adverse employment action, and that the circumstances surrounding that action gave rise to an inference of discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  More specifically, to establish a prima facie claim of discriminatory failure to promote, a plaintiff must establish that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."  Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (quoting McDonnell Douglas, 411 U.S. at 802) (internal quotation marks omitted).  If these requirements are met, a defendant may rebut the resulting presumption of discrimination by providing a nondiscriminatory reason for the conduct underlying the allegations.  The presumption of discrimination arising from the prima facie case drops out upon such a proffer of a legitimate nondiscriminatory reason, leaving the plaintiff with the burden of offering proof that would enable a reasonable fact finder to conclude that the proffered reason was a pretext and that the

plaintiff's protected characteristic was at least one of the motivating factors in the decision.

Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000). A plaintiff may rely at the

rebuttal stage on the same facts underlying the prima facie case so long as a preponderance of the

evidence could allow a reasonable fact finder to find that a violation has occurred. Holtz v.

Rockefeller & Co., 258 F.3d at 78; see Carlton, 202 F.3d at 135.

Plaintiff's prima facie case for disparate treatment is weak at best. His proffer of

his qualifications – principally his own assertions that his on the job behavior was consistent with

his subjective understanding of applicable unwritten workplace rules – is minimal. His proffer of

a basis for an inference of discrimination is generally limited to conclusory assertions,

unsupported by evidence identifying better-treated females, that he was denied opportunities

because of his gender. However, since the plaintiff's burden at the prima facie case stage is only

a minimal one (see Carlton, 302 F.3d at 134 and cases cited therein), the Court will assume

without deciding that Plaintiff's proffers are sufficient to meet the standards as to all but his

disparate treatment claims relating to promotions.

With respect to each of the areas of alleged disparate treatment that Plaintiff has

identified, Oxford has proffered specific evidence indicative of a legitimate nondiscriminatory

reason for the action as well as evidence that male and female employees were treated similarly.

Thus, the record includes evidence that the changes in Plaintiff's job duties and work schedule

were made in conjunction with the restructuring of the White Plains office and that both male

and female MMCs experienced such changes. This evidence is undisputed. Neither Plaintiff's

conclusory assertions that he was singled out nor his generalized assertions that Oxford was a

friendlier workplace for female employees than for male employees is sufficient to frame a

triable issue as to whether there was any gender-based disparate treatment with respect to Plaintiff's work schedule and duties.

With respect to Plaintiff's claims concerning the denial of promotions, the record is less than conclusive as to the precise procedures employees were expected to follow to apply for positions that were not "posted." Plaintiff's own uncontroverted evidence makes it clear, however, that both Plaintiff and other Oxford employees, male and female, were aware of the positions Plaintiff claims he sought and that male and female candidates were considered for the positions. Plaintiff identifies the successful candidate for only one of the positions – Rosa Petagine – and cites evidence indicating that both male and female employees complained that her selection had been the result of favoritism. Plaintiff proffers no specific evidence that he was qualified for any of the positions. His only proffer regarding the inferiority of Petagine's qualifications to his is an assertion that she had been a secretary with no specific prior experience in the job function. He disclaims knowledge as to the qualifications of the other successful candidates and acknowledges that one was a man. (Cruz Dep. at 218). Furthermore, although Plaintiff complains that poor evaluations and writeups documenting his noncompliance with Oxford's policies and workplace rules may have precluded him from eligibility for the positions and were the product of excessive scrutiny or hostility by his supervisors, he proffers no evidence from which a reasonable fact finder could determine that such evaluations and writeups were motivated by gender-based discrimination. Plaintiff has thus failed to proffer a prima facie case with respect to his claim of discriminatory failure to promote.

Thus, because the evidence of record, even viewed in the light most favorable to Plaintiff, could not support a reasonable fact finder's determination that Plaintiff has carried his

burden of demonstrating that he was subjected to gender-based disparate treatment, Defendant is

entitled to judgment in its favor as a matter of law on this claim.

### Hostile Work Environment Claim

> Title VII . . . makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ..' . . .[T]his language 'is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment. . . . When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted); see Mack v. Otis

Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).

In evaluating the severity or pervasiveness of the allegedly discriminatory

workplace conduct, a court must look at all of the circumstances.  See Harris, 510 U.S. at 23.  A

non-exclusive list of factors that courts consider in making such a determination includes "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  Id.  The standard for evaluating a hostile work environment

claim is both subjective and objective: the victim must subjectively perceive the environment to

be abusive so that it actually alters the conditions of the victim's employment, and the conduct

must also be so pervasive or severe that a reasonable person would find the environment abusive.

Id.

Plaintiff has alleged that Laurie DeRosa, a person to whom his supervisor reported, subjected him to a hostile work environment by requesting that he wear a brown suit to a meeting, by inappropriately stroking the back of his head, and by making sexual advances toward him linked to suggestions of career advancement at Oxford. (Cruz Dep. at 131.) Plaintiff also claims that, as a result of having spurned DeRosa, he was subjected to intensified scrutiny by DeRosa and his immediate supervisor and that he was reprimanded for minor violations of Oxford policies that were not enforced against his female co-workers.

Neither of these sets of circumstances, taken individually or together, is sufficient on the record before this Court to frame a genuine issue of material fact as to whether Plaintiff was subjected to a hostile work environment. Viewing DeRosa's alleged approaches for the sake of this analysis as gender-based acts of harassment or discrimination, Plaintiff's own testimony regarding his reactions to the alleged incidents is insufficient to support a determination by a reasonable fact finder that Plaintiff himself found them so abusive that they altered the terms of his work environment, or that a reasonable person would have found them so. Plaintiff himself testified that initially he regarded DeRosa's request that he wear a brown suit as "innocent" (id. at 88), and her stroking of his hair as "overly friendly." (Id. at 94.) Thus, Plaintiff has failed to show that these actions by DeRosa were subjectively offensive to him. With respect to the alleged sexual proposition, regardless of its inappropriateness, Plaintiff has not proffered evidence that could support a determination that the incident was so severe as to create a hostile work environment. At no time during the incident did DeRosa threaten Plaintiff with adverse consequences if he did not comply, nor did she make any further advances after being rejected.

(Id. at 136-137.)  The undisputed facts that Plaintiff did not immediately report the incident, and that he did not pursue further action after eventually complaining to Brown, further undermine any possible inference that the incident was so severe or pervasive as to alter the conditions of Plaintiff's employment.

Plaintiff's claims of hostile work environment based on excessive scrutiny and writeups also fail to raise a triable issue as to whether he suffered the sort of severe or pervasive discriminatory conduct that is required to establish a hostile work environment claim.   As explained in the preceding section of this Opinion, Plaintiff has failed to raise a triable issue as to whether these actions were the product of gender-based discrimination.  Assuming for purposes of this analysis that Plaintiff has proffered evidence on the basis of which the conduct could be found retaliatory in origin and that such retaliation for spurning and reporting a sexual advance constitutes discriminatory conduct for purposes of the hostile work environment construct, Plaintiff has failed to raise a triable issue as to whether the disciplinary actions were severe or pervasive enough to create a hostile work environment.  Cf. Parrish v. Sollecito, 249 F. Supp. 2d 342, 349-50 (S.D.N.Y. 2003) (finding the existence of a genuine issue of material facts as to the pervasiveness and/or severity of plaintiff's hostile work environment claim where defendant made repeated, unwanted physical contacts near plaintiff's groin region).

The uncontroverted evidence of record demonstrates that Plaintiff did in fact violate Oxford's rules with respect to the use of unplanned absences, personal use of telephones and use of vulgarity in the workplace.  The evidence also demonstrates that others in Plaintiff's department and work classification – men and women, and people as to whom there is no allegation that they were the targets of retaliation – were also disciplined for like infractions.

Plaintiff's conclusory arguments – largely unsupported by admissible evidence – that the absences were taken and phone calls made in the context of an ongoing family medical situation, and that discipline was not meted out in precisely the same fashion in every case, are insufficient to raise any triable issue as to whether the company's actions were unfounded or so severe or pervasive, compared to the normal application and enforcement of these policies, to have constituted a level of discriminatory intimidation that illegally altered the terms and conditions of his working environment.

Defendant is, accordingly, entitled as a matter of law to judgment in its favor on Plaintiff's hostile work environment claim.

### *Quid Pro Quo Sexual Harassment Claim*

To establish a prima facie claim of quid pro quo sexual harassment, a plaintiff must show that he "was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment." Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir. 1994). A plaintiff must suffer "explicit discriminatory alterations in the terms or conditions of [his] employment" in order to prevail on a quid pro quo sexual harassment claim. Jin v. Metro. Life Ins. Co., 310 F.3d 84, 91 (2d Cir. 2002). Such alterations include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998). The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of

sexual advances.  <u>Karibian</u> 14 F.3d at 778.

Here, Plaintiff alleges that the changes in his job duties, negative evaluations, failure to gain promotions, disciplinary actions, employment termination, and denial of unemployment benefits of which he complains constituted the denial of tangible job benefits resulting from his rejection of DeRosa's alleged advance.  Plaintiff has, however, failed to come forward to with sufficient admissible, non-speculative evidence to frame a triable issue of fact as to whether these actions were the result of <u>quid</u> <u>pro</u> <u>quo</u> sexual harassment.

Consistent with its obligation to view all facts in the light most favorable to the non-moving party, the Court assumes that the incident between Plaintiff and DeRosa actually occurred as Plaintiff describes it, and that DeRosa's alleged statements to Plaintiff were intended to convey a promise of advancement at Oxford should he accede to the proposition and an implicit threat of adverse consequences if he did not.  But "plaintiff must still show that "[his] reaction to [unwelcome sexual advances] was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment."  <u>Karibian</u>, 14 F.3d at 777. As explained above, Defendant has proffered uncontroverted evidence that the job duty and schedule alterations of which Plaintiff complains were made as a result of restructuring and affected others besides Plaintiff in similar fashion, that Plaintiff actually committed the violations of workplace rules for which he was disciplined and that stricter enforcement of those rules was both announced in connection with the restructuring and evidenced by the discipline of a number of Plaintiff's co-workers for similar infractions, and that Plaintiff's termination was the result of his violation of the workplace rules.  Plaintiff has also failed to demonstrate that he was qualified for the positions to which he claims he was denied appointment or that those who were appointed

to the positions were less qualified than he.

Furthermore, Plaintiff has not controverted Oxford's evidence that DeRosa was not involved in the termination decision or the other job-related actions of which Plaintiff complains. Rather, citing mentions of DeRosa in, or "cc's" to DeRosa of, documentation relating to the discipline of other employees for job infractions, Plaintiff argues that DeRosa must necessarily have been involved in decisions affecting his employment. Mere speculation or conjecture is insufficient to raise a genuine issue of material fact as to DeRosa's involvement in the decisions. <u>Kerzer</u>, 156 F.3d at 400; <u>Cifarelli</u>, 93 F.3d at 51. Moreover, the uncontroverted evidence that DeRosa was connected in some way with similar disciplinary actions involving other male and female employees to whom she is not alleged to have made advances undermines any reasonable basis that might exist for an inference that she made or directed a decision to discipline Plaintiff for similar violations in order to punish him for refusing her alleged advance.

Viewing the entire evidentiary record in the light most favorable to Plaintiff, the Court finds that no reasonable fact finder could discern that Plaintiff has proffered sufficient evidence to support the requisite linkage between tangible job benefits and the acceptance or rejection of DeRosa's alleged advance. <u>See</u> <u>Hamilton v. Bally of Switzerland</u>, No. 03 Civ. 5685, 2005 WL 1162450, *10 (S.D.N.Y. Apr. 17, 2005) (granting summary judgment when plaintiff "failed to create a genuine issue of material fact as to any linkage between her rejection of [her supervisor's] perceived sexual advances" and her subsequent termination); <u>Tabachnik v. Jewish Theological Seminary of America</u>, No. 03 Civ. 2759, 2004 WL 414826, *2 (S.D.N.Y. Mar. 4, 2004) (holding that "some evidence of a causal connection between the alleged sexual harassment and [one's] termination" is required in order for plaintiff to defeat defendant's <u>quid</u>

pro quo summary judgment motion). Oxford is, accordingly, entitled as a matter of law to

summary judgment in its favor on Plaintiff's quid pro quo sexual harassment claim.


*Retaliation Claim*

Plaintiff claims that the same employment actions were inflicted on him in

retaliation for his reporting to Brown of DeRosa's alleged sexual advances. Claims of

discriminatory treatment in retaliation for Title VII-protected speech are also analyzed using the

burden shifting rules established in McDonnell Douglas. To make out a prima facie case of

retaliation, a plaintiff must show that: (1) he or she was engaged in protected activity; (2) the

employer was aware of the activity; (3) the employee suffered an adverse employment action;

and (4) there was a causal connection between the protected activity and the adverse action taken

by the employer. Mack v. Otis Elevator Co., 326 F.3d at 129. "Protected activity" refers to any

action taken to protest or oppose discrimination prohibited by the statute. 42 U.S.C. § 2000e-3;

Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). An "adverse employment action"

is something that is "more disruptive than a mere inconvenience or an alteration of job

responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

Such actions typically include "a termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices that might be unique to a particular

situation." Sanders v. New York City Human Resources Admin., 361 F.3d 749, 755 (2d Cir.

2004) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).

Plaintiff's allegation that he complained about DeRosa's proposition to Brown,

his supervisor, suffices to meet the first two elements of the prima facie case. His termination, at least, constitutes an adverse employment action, thus meeting the third criterion. As to the fourth element, "[p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct . . .." DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (citations omitted) (emphasis in original). Here, Plaintiff's employment was terminated within some three to five months after the general time frame in which he places the alleged proposition, and certain of the negative evaluations and disciplinary actions were also taken within that time frame. This temporal proximity is sufficient to meet his minimal prima facie case burden as to the causal connection element.

As with disparate treatment claims, if the plaintiff can make out a prima facie case, the burden shifts to the defendant "to articulate a 'legitimate, nondiscriminatory reason' for its actions." Johnson v. Palma, 931 F.2d 203, 207 (2d. Cir. 1991) (citation omitted). If the defendant is successful, "the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

As discussed in detail above, Oxford has proffered evidence of legitimate nondiscriminatory reasons for Plaintiff's termination and for the disciplinary actions underlying the termination. Oxford has also proffered evidence that other employees were disciplined for similar infractions. This evidence is sufficient to rebut the presumption established by Plaintiff's prima facie case. In the absence of the presumption, Plaintiff's speculative and

conclusory allegations of targeting and of a conspiracy between Brown and DeRosa are insufficient, even in light of the time frame in which many of the events occurred and even when the evidence of record is viewed in the light most favorable to Plaintiff, to raise a triable issue as to whether Plaintiff's termination or any of the other actions of which he complains were the products of retaliation for his reporting of DeRosa's alleged quid pro quo advance. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (holding "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases"); Butts v. N.Y.C. Dep't. of Housing Preservation and Development, No. 00 Civ. 6307, 2007 WL 259937, * 19 (S.D.N.Y. Jan. 29, 2007) (granting defendant summary judgment on plaintiff's Title VII retaliation claim because plaintiff's allegations of pretext were conclusory and speculative); Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 448 (S.D.N.Y. 2002) (holding "[w]here, as in this case, the employer provides convincing evidence to explain its conduct, and plaintiff's argument consists of purely conclusory allegations of retaliation, the Court may conclude that no material issue of fact exists and grant summary judgment for the employer"). Defendant is therefore entitled to judgment in its favor with respect to Plaintiff's retaliation claim.

Motion to Strike the Barbara Matthews Attorney Certification

The Second Circuit has held that "a court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." Hollander v. Amer. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999)) (abrogated on other grounds by Schnabel v. Abramson, 232 F.3d 83 (2d Cir.

2000) (citing <u>United States v. Private Sanitation Indus. Ass'n. Of Nassau/Suffolk, Inc.</u>, 44 F.3d

1082, 1084 (2d Cir. 1995).)  Paragraphs ten through twenty-one of Plaintiff's attorney's

certification accompanying Plaintiff's Memorandum in Opposition to Defendant's Motion for

Summary Judgment are conclusory arguments inappropriate for an attorney's certification and

are hereby stricken.  In addition, Plaintiff's allegations relating to the reasons for DeRosa's

separation from Oxford were ruled stricken from the Amended Complaint by Magistrate Judge

Francis as irrelevant.  (<u>See</u> Def.'s Mem. In Supp. Mot. To Strike, Ex. C. at 3-5.)  For

substantially the reasons articulated in Judge Francis' November 17, 2004, Order, paragraphs

twenty-two through twenty-seven of Plaintiff's attorney's certification are stricken as irrelevant

to the extent they discuss DeRosa's alleged termination from Oxford for sexual misconduct.


<u>Request for Sanctions Against Plaintiff's Attorney</u>

            In its response to Plaintiff's motion to reopen discovery, Defendant requests that

the Court grant sanctions against Plaintiff and his counsel, alleging that Plaintiff's attorney has

deliberately delayed the timely progress of this case by submitting frivolous pleadings.

Defendant invokes 28 U.S.C. §1927, the inherent power of the Court, and Rule 11 of the Federal

Rules of Civil Procedure.  As acknowledged in Defendant's memorandum of law in support of

its request, the imposition of sanctions pursuant to section 1927 or the Court's inherent power

requires a finding of bad faith – "an award . . . is proper when the attorney's actions are so

completely without merit so as to require the conclusion that they must have been undertaken for

an improper purpose such as delay."  (Def.'s Opp. To Mot. To Reopen Discovery and Reply in

Further Supp. of Mot. to Strike at 14.)  Although the Court has found the discovery motion

meritless, the record does not support a finding that it must have been undertaken solely for an improper purpose such as delay. Accordingly, the motion for sanctions is denied insofar as it rests on the inherent power of the Court or section 1927.

The motion is denied insofar as it invokes Rule 11 as well. Rule 11 of the Federal Rules of Civil Procedure requires that a motion for sanctions "be made separately from other motions or requests . . . ." Fed. R. Civ. P. 11(c)(1)(A). Additionally, a request for sanctions must be served on the subject of the motion, "but shall not be filed with or presented to the court unless, within 21 days after service of the motion . . . the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn." Id.; see Storey v. Cello Holdings, LLC, 347 F.3d 370, 389 (2d Cir. 2003). Here, Defendant's request for sanctions against Plaintiff and his attorney was made in the final section of its Memorandum In Opposition to Plaintiff's Motion to Reopen Discovery. No separate motion was filed or served. Additionally, Defendant has not allowed Plaintiff the twenty-one day "safe harbor" before requesting sanctions with the Court. Defendant has failed to comply with the procedural requirements of the Rule on which it relies. Therefore, Defendant's sanctions request is denied in its entirety.


CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted in its entirety. Defendant's motion to strike Plaintiff's attorney's certification is granted with respect to paragraphs ten through twenty-seven of the certification to the extent set forth above, and is denied in all other respects. Defendant's request for sanctions is denied, as is Plaintiff's motion to reopen discovery. The Clerk of Court is respectfully requested to enter

judgment accordingly and close this case. This decision resolves docket entry nos. 40 and 59.


SO ORDERED.

Date:   New York, New York
        February 25, 2008


LAURA TAYLOR SWAIN
United States District Judge